CITY OF WHITTIER, a Municipal
Corporation, Appellant,

v.

WHITTIER FUEL AND MARINE
CORPORATION, an Alaskan
Corporation, Appellee.

No. 3315.

Supreme Court of Alaska.

March 10, 1978.

Ben J. Esch, Dickson, Evans, Esch & Papas, Anchorage, for appellant.

Carney W. Mimms, III, Paul J. Nangle & Associates, Anchorage, for appellee.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR and BURKE, JJ.

## OPINION

BOOCHEVER, Chief Justice.

This is a civil appeal from a judgment entered against the City of Whittier for breach of contract. The following issues are presented: (1) did the superior court err in denying the City of Whittier's motions for directed verdict, judgment notwithstanding the verdict and new trial because the damages were unforeseeable or uncertain; (2) did the superior court err in denying a new trial because the verdicts were inconsistent; (3) did the superior court err in giving certain jury instructions because the instructions implied that damages were, in fact, sustained and (4) did the superior

court err in granting pre-judgment interest? We find error as to some of the damages awarded and the granting of pre-judgment interest.

## FACTUAL BACKGROUND

On September 13, 1973, John P. Lynch and appellant, City of Whittier (the "City," hereinafter), entered into an agreement by which the City leased to Lynch a fuel float and access ramp located in the boat harbor at Whittier, Alaska, "for the purpose of selling petroleum products to the users of the said boat harbor." In addition, the agreement provided that the City would lease to Lynch a fuel truck at a monthly rental of $25.00. The term of the lease of the vehicle, fuel float and ramp was five years. Lynch further agreed to pay the City $.01 rental for each gallon of fuel sold.[1]

Shortly after the agreement was operative, the lease was assigned by Lynch to appellee, Whittier Fuel & Marine Corporation[2] ("Whittier Fuel," hereinafter).

During the winter of 1973–74, Whittier Fuel delivered heating fuel to customers in Whittier, using the leased fuel truck. Lynch testified that approximately 370,000 gallons of fuel were delivered between October 1973 and May 1974.[3] Net profit for Whittier Fuel was estimated at $.07 a gallon. This testimony was uncontroverted.

On July 17, 1974, an employee of the City took possession of the fuel truck leased to Whittier Fuel. A replacement fuel truck was located by Whittier Fuel with some difficulty, due to the demand for equipment in Alaska which was generated by the construction of the Trans-Alaska Pipeline.[4]

Lynch testified that the replacement truck was inferior to the leased truck in several aspects—most notably, the leased truck had three fuel compartments, while the replacement truck had one compartment. Thus, it was necessary to pump all fuel out of the replacement truck before fuel of a different type could be carried, whereas three types of fuel could be transported in the leased truck.[5]

Whittier Fuel was the only commercial fuel dealer in Whittier when the leased truck was seized in July of 1974. By June 3, 1975, when this action was filed in superior court, Whittier Fuel, the City, Begich Towers and Sportsman's Inn were operating their own fuel trucks.[6]

At trial, the City did not contest the issue of breach. Whittier Fuel sought to recover damages for the cost of replacing the leased truck and for loss of net profits.[7]

The City moved for a directed verdict on the ground that the damages were speculative. The motion was denied, but jury instructions were modified due to the City's motion. The City took exception to Instructions 13 and 16. Special verdict forms were presented to the jury which returned an award of $68,650.00 for loss of net profits. The special verdict for costs incurred in replacing the fuel truck was returned blank and unsigned.

The City then moved for judgment notwithstanding the verdict or a new trial on the grounds that the damages were beyond the contemplation of the parties when the contract was made and that the damages were speculative. The motion was denied,

1. The contract specified that the lessee pay $.01 per gallon of all oil and gasoline "delivered."

2. Lynch is President and General Manager of Whittier Fuel and owns a 50 percent interest.

3. This represented an estimated 150,000 gallons to the City, 150,000 gallons to Begich Towers and 70,000 gallons to Sportman's Inn. Deliveries were not under contract.

4. Both parties assert that the time period was perhaps as long as 24 days.

5. In addition, the replacement truck had defective gears which prevented the truck from climbing hills.

6. The truck operated by the City was the truck still under lease to Whittier Fuel. On March 17, 1975, however, the City had contracted with Whittier Fuel for delivery of the City's 150,000 gallons by Whittier Fuel at a fixed tariff.

7. Whittier Fuel's request that the jury consider the fair rental value of the seized truck was denied. This denial is not at issue here.

and judgment was entered including interest of $8,485.14. This appeal followed.

## FORESEEABILITY OF DAMAGES

It is the City's contention that it was not within the contemplation of the parties at the time of the making of the contract that Whittier Fuel would use the leased fuel truck to make deliveries in Whittier, as opposed to merely "shuttling" fuel from incoming railroad tank cars to storage tanks at the fuel float. The City argues that the evidence was insufficient to show that the parties contemplated a broader use of the fuel truck and that, therefore, damages for loss of deliveries were unforeseeable. Thus, the City asserts that its motions for directed verdict, judgment notwithstanding the verdict and new trial were improperly denied.

 The standard of review regarding denial of motions for a directed verdict and judgment notwithstanding the verdict is as follows:

It is well established that the proper role of this court, on review of motions for directed verdict or for judgment notwithstanding the verdict, is not to weigh conflicting evidence or judge the credibility of the witnesses, but is rather to determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable men could not differ in their judgment.[8]

The test is objective; and, if there is room for diversity of opinion among reasonable people, the question is one for the jury.[9]

Further, all favorable inferences are to be accorded the non-moving party.[10]

We thus must examine the evidence presented at trial to determine if the jury's finding of foreseeability, implicit in its verdict, is supported by the evidence when viewed in the light most favorable to Whittier Fuel.

Prior to the lease agreement, Lynch had operated the City-owned fuel truck to make deliveries in Whittier. Although the boating season was over by September, the lease agreement provided that an attendant had to be on call at the float at least eight hours daily from October 1 to May 11. A reasonable purpose for requiring that the float be open even when the boating season was not would be to assure that Whittier Fuel would be available for fuel deliveries to the town. Whittier Fuel was the only commercial fuel dealer in Whittier, and hauling fuel could be implied in the lease agreement. Lynch testified that he had permission from the City to make deliveries with the leased truck. There was testimony that a majority of the Council wanted Whittier Fuel to deliver heating fuel, and that the City never objected to such deliveries.[11]

 It is, of course, well established that damages for breach of contract must be foreseeable. This principle was originally formulated by the English Court of Exchequer in *Hadley v. Baxendale*,[12] and it is the applicable rule in Alaska:

"selling petroleum products to the users of the said boat harbor," and required approval of the City for other uses. There was testimony that it was not contemplated that the truck would be used for fuel deliveries and that the lease agreement was made to parallel an agreement between the City and the state which pertained only to the fuel float. Moreover, Lynch admitted that he paid the $.01 per gallon rental fee to the City only for fuel pumped from storage tanks at the fuel float. The fee was not paid on the 370,000 gallons delivered in the town during the winter of 1973-74.

**8.** *Holiday Inns of America, Inc. v. Peck,* 520 P.2d 87, 92 (Alaska 1974); *see also, Teller v. Anchorage Asphalt Paving Co., Inc.,* 545 P.2d 177, 180 (Alaska 1976).

**9.** *City of Fairbanks v. Nesbett,* 432 P.2d 607, 610 (Alaska 1967).

**10.** *See Ferriss v. Chugach Electric Ass'n, Inc.,* 557 P.2d 763, 765 (Alaska 1976); *Mallonee v. Finch,* 413 P.2d 159, 160 (Alaska 1966); *Otis Elevator Company v. McLaney,* 406 P.2d 7, 9 (Alaska 1965).

**11.** There was also conflicting testimony supporting the City's position. The contract was silent on the use of the truck. The lease agreement stated that the purpose of the lease was

**12.** 9 Exch. 341, 156 Eng.Rep. 145 (1854).

The general rule is that damages for breach of contract are limited to such losses as were in the contemplation of the parties at the time the contract was made.[13]

The City is correct as to the applicable law. In *Skagway City School Board v. Davis,* 543 P.2d 218 (Alaska 1975), a wrongfully-discharged superintendent sought damages in contract for injury to reputation, in addition to loss of salary. We found that damages for loss of reputation could not be "reasonably presumed to have been within the contemplation of the parties when they entered the contract." *Id.* at 225. We stated that mere knowledge of possible harm flowing from a breach would not be sufficient to impose liability. *Id.* at 226. Rather:

> The knowledge must be brought home to the party sought to be charged, under such circumstances that he must know that the person he contracts with reasonably believes that he accepts the contract with the special condition attached to it.[14]

We reaffirmed this rule in *Arctic Contractors, Inc. v. State,* 564 P.2d 30, 44–45 (Alaska 1977).

The crux of the City's argument on appeal is that, where damages are claimed for circumstances not appearing on the face of the contract, a "tacit agreement" must be shown to have existed between the parties that the contract contemplate the additional circumstances and possible damages resulting therefrom. The City argues that there was insufficient evidence that such a "tacit agreement" existed at the time of contract.[15] We do not agree.

■ From the evidence presented, we conclude that a jury could find that the City knew that Whittier Fuel reasonably believed that the fuel truck would be used for deliveries at the time the contract was made.[16] Thus, there was no error in denying a directed verdict or judgment notwithstanding the verdict on the issue of foreseeability.

■ The foregoing discussion largely disposes of the City's claim that the superior court erred in failing to grant a new trial due to insufficient evidence of foreseeability.

**13.** *Western Airlines, Inc. v. Lathrop Co.,* 499 P.2d 1013, 1021 n.23 (Alaska 1972); *see also,* McCormick, Law of Damages, § 138 (1935).

**14.** *Skagway City School Board v. Davis,* 543 P.2d at 226, *quoting Globe Refining Co. v. Landa Cotton Oil Co.,* 190 U.S. 540, 545, 23 S.Ct. 754, 756, 47 L.Ed. 1171, 1174 (1903), *quoting British Columbia and Vancouver's Island Spar, Lumber and Saw-Mill Co. v. Nettleship, L.R.,* 3 C.P. 499, 500, All E.R. Reprint 339, 340 (1868). *Cf., ERA Helicopters, Inc. v. Digicon Alaska, Inc.,* 518 P.2d 1057, 1060 (Alaska 1974), where an instruction on this point was rejected as applicable to contract, but not tort, litigation.

**15.** The City concedes that it knew of the use of the fuel truck for deliveries prior to the breach but claims that such information was not communicated to it at the time of the contract.

**16.** *Globe Refining Co. v. Landa Cotton Oil Co., supra,* and *British Columbia and Vancouver's Island Spar, Lumber and Saw-Mill Co. v. Nettleship, supra,* which we cited in *Skagway City School Board v. Davis, supra* Note 14, and on which the City primarily relies here, do not lead us to a different conclusion. *Globe Refining* involved a sales contract for crude oil between Kentucky and Texas corporations wherein the plaintiff, suing for breach of contract, sought to recover damages for nonrefundable advances made to a railroad for transportation of tank cars to receive the oil. The trial court's measure of damages by the cost of cover for the unavailable oil was affirmed. The United States Supreme Court held that there was no agreement by the breaching party to assume the risks for which the plaintiff sought damages. 109 U.S. at 545–46, 26 S.Ct. at 756, 47 L.Ed. at 1173–74. In *Nettleship,* the plaintiff sought to recover lost profits when a shipment of essential parts for machinery was lost in transit from the United Kingdom to Vancouver Island. There being no evidence that the carrier knew the contents of the shipment, or their importance, or that the carrier agreed to assume the additional risk, lost profits were not recoverable. In the present case, evidence was presented regarding the past use of the fuel truck. Moreover, the parties were not geographically remote, as in *Globe Refining* and *Nettleship.* Nor were the damages sought necessarily collateral to the basis for the contract, as occurred in *Skagway.*

The matter of granting or refusing a new trial rests in the sound discretion of the trial judge.[17]

In reviewing a ruling on a motion for a new trial, the court will not interfere with the trial judge's discretion "except in the most exceptional circumstances and to prevent a miscarriage of justice."[18] If there is an "evidentiary basis" for the jury's decision, the denial of a new trial must be affirmed.[19] Conversely, where "evidence to support the verdict [is] completely lacking or [is] so slight and unconvincing as to make the verdict plainly unreasonable and unjust," a reversal of a denial of a new trial is proper.[20]

We find an evidentiary basis for foreseeability and hold that the trial court did not abuse its discretion in denying the motions to the extent that they were based on that contention.

### CERTAINTY OF DAMAGES

The City also contends that the superior court erred in denying its motions for directed verdict, judgment notwithstanding the verdict and new trial because the damages were not proven with certainty.

The goal of damage awards for breach of contract is to place the injured party in as good a position as he would have been if the contract had been fully performed.[21] Thus, lost profits, if proven, may be recovered. An award cannot stand, however, if the amount is the result of speculation,[22] although it is not necessary to prove lost profits with exactness so long as actual loss of profits is shown and the jury has a reasonable basis on which to compute its award.[23] We shall again examine the evidence before the jury.

The City admitted liability for lost profits during the period after the seizure and before a replacement truck was found when Whittier Fuel was without any fuel truck. Whittier Fuel delivered 370,000 gallons of fuel between October 1973 and May 1974 (150,000 gallons to the City; 150,000 gallons to Begich Towers and 70,000 to Sportman's Inn) at a profit of $.07 a gallon. The City gave away fuel on one day, costing Whittier Fuel $2,000.00 in lost profits. Lynch testified that the seizure of the leased truck caused Whittier Fuel to lose an opportunity to deliver fuel to the Shotgun Road Project. Whittier Fuel had made deliveries to that Project for part of one month when the truck was seized. Lynch testified that 150,000 gallons of fuel were delivered by the City, using the leased truck, during the remainder of the summer of 1974 after the seizure of the truck. Lynch had observed the railroad tank cars as they arrived in Whittier, and stated that the fuel was delivered by the City to the Shotgun Road Project, to Begich Towers and to city shops. Lynch testified that Whittier Fuel also lost sales to the City until the delivery contract of March 1975 was signed.[24]

Lynch testified that Whittier Fuel lost the Begich Towers' business due to seizure of the leased truck. The contract was lost twice: first, when the truck was seized, and, second, in February of 1975 "because of poor delivery service." Begich Towers purchased their own fuel truck early in 1975, prior to Whittier Fuel's second loss of

---

17. *Ahlstrom v. Cummings,* 388 P.2d 261, 262 (Alaska 1964).

18. *Sloan v. Atlantic Richfield Co.,* 541 P.2d 717, 723 (Alaska 1975), *quoting Ahlstrom v. Cummings,* 388 P.2d at 262.

19. *Olson v. McRae,* 389 P.2d 576, 577 (Alaska 1964).

20. *Ahlstrom v. Cummings,* 388 P.2d at 262.

21. *McBain v. Pratt,* 514 P.2d 823, 828 (Alaska 1973); *Green v. Koslosky,* 384 P.2d 951, 952 (Alaska 1963).

22. *Dowling Supply and Equipment, Inc. v. City of Anchorage,* 490 P.2d 907, 909–10 (Alaska 1971).

23. *Id.* at 909. *See also,* Williston on Contracts, § 1345 at 231–40 (3d ed. 1968); Corbin on Contracts, §§ 1021–1022 at 127–47 (1964).

24. His testimony, however, was inconsistent: he had stated earlier that Whittier Fuel supplied fuel to the City "and other buildings" between September 1974 and May 1975.

their business. Lawrence Steffen, a member of the Board of Directors of the Begich Towers Homeowners Association, testified that Begich Towers terminated business with Whittier Fuel due to "problems with . . . water in the fuel," not because of problems with delivery.

Whittier Fuel lost the Sportsman's Inn business at the same time as the loss of Begich Towers. The Sportman's Inn had purchased a truck. Lynch admitted, however, that Whittier Fuel had no contracts for fuel delivery to the Begich Towers or Sportman's Inn. Further, until the March 1975 agreement, Whittier Fuel had no contract for delivery to the City.

 Lynch testified to the general unprofitability of Whittier Fuel following the seizure of the leased truck. Tax returns for two fiscal years (October 15, 1973 to May 31, 1974, and June 1, 1974 to May 31, 1975) were introduced to show loss of profits. The earlier return showed taxable income of $16,506.00. The later return showed a net loss of $12,976.00.[25] Whittier Fuel also introduced fuel invoices from Tesoro-Alaskan Petroleum Corporation and Standard Oil Company of California and a ledger page showing payments.[26]

 On the basis of the foregoing evidence, we conclude that damages were not proven with sufficient certainty to sustain an award of the full sum of $68,650.00.

Two aspects of certainty are involved: certainty as to amount and certainty as to causation. We shall address them in that order.

Whittier Fuel offers the following "break-down" of the damage award in support of its contention that there was sufficient evidence to sustain the entire amount:

| | |
|---|---:|
| Loss of profit for one day of sales | $ 2,000.00 |
| Loss of sales to Begich Towers (150,000 gallons a year for lifetime of contract) | 31,500.00 |
| Loss of sales to Sportman's Inn (70,000 gallons a year for lifetime of contract) | 12,250.00 |
| Loss of sales to Shotgun Cove Project (150,000 gallons) | 10,500.00 |
| Loss of sales to the City (150,000 gallons) | 10,500.00 |
| TOTAL | $66,750.00 |

These figures were derived by multiplying the number of gallons allegedly lost by the profit margin of $.07 per gallon. Whittier Fuel also contends that there was a loss of profitability on sales in general.

The City contends that the $.07 margin, the number of gallons and the $2,000.00 profit figure are without sufficient supporting data to establish their reliability. Primary reliance is placed upon several Oregon cases. In *Levene v. City of Salem,* 191 Or. 182, 229 P.2d 255, 263 (1951), a tort case, the court stated:

> The evidence must afford sufficient data from which the court or jury may properly estimate the amount of damages, which data shall be established by facts rather than by mere conclusions of witnesses.[27]

The City objected to the sufficiency of the returns as proof of damages, not to their introduction into evidence. We believe that the subject of the objection was cured by the instruction.

---

25. The tax returns were admitted into evidence without the accompanying schedules, although the schedules are a part of the record on appeal. We have previously disapproved of use of net income as reported for income tax purposes for ascertaining damages since irrelevant deductions may affect the ultimate taxable income. *State v. Stanley,* 506 P.2d 1284, 1293 (Alaska 1973). The City asked for an instruction that net income for tax purposes was not a proper basis for assessing damages. A precautionary instruction was given as follows:

 Net income as reported for income tax purposes is not a proper basis for ascertaining damages for loss of use of the truck for there may be deductions reported for income tax purposes unrelated to actual operating expenses.

26. These exhibits, although before the court, were not designated part of the record on appeal. Accordingly, we shall not examine their contents. *See* Appellate Rule 9(a).

27. *See also, Kwipco, Inc. v. General Trailer Company, Inc.,* 267 Or. 184, 515 P.2d 1317, 1319 (1973); *cf., Pearson v. Schmitt,* 259 Or. 439, 487 P.2d 84, 86 (1971) (recovery of lost profits in tort).

■ We believe there was sufficient testimony and supporting data presented here to establish a jury question. Lynch testified with respect to a specific profit margin; the number of gallons of fuel in lost sales was prorated on the basis of the previous year's experience as well as Lynch's observation of incoming tank cars; furthermore, his estimate of the $2,000.00 lost profit figure for one day's sales could be examined for its reasonableness in light of the other testimony.[28]

■ We will not require that a plaintiff in a contract suit present an accountant's balance sheet in order to substantiate his damages. Once actual damages are shown and there is a reasonable basis for computing an award, a defendant's opportunity for pre-trial discovery of the evidentiary basis for the amount claimed, the right to cross-examine witnesses and to present evidence, as well as the judge's duty to instruct the jury on the issue of certainty[29] provide adequate protection against speculative verdicts. We conclude that there was sufficient certainty as to the amount of damages.

■ We believe, however, that with respect to certainty in causation of damages, the full award cannot stand. Our review of the evidence convinced us that there was insufficient proof that the loss of the business of Begich Towers and Sportsman's Inn was due to the seizure of the leased truck. It was incumbent upon Whit-

tier Fuel to show a nexus between the wrongful conduct of the City and the decision of Begich Towers and Sportsman's Inn to haul their own fuel.[30] Lynch's testimony alone cannot fulfill this burden since the issue is one of subjective motivation on the part of the proprietors of the enterprises. Indeed, Lawrence Steffen of Begich Towers Homeowners Association testified that Whittier Fuel's services were terminated due to "water in the fuel," not because of poor delivery. No direct evidence has been presented that the watered fuel was caused by defects in the replacement truck. No representative of Sportsman's Inn testified as to its reason for purchasing a new truck. Since that purchase occurred long after Whittier Fuel had replaced the truck taken by the City, it would be pure speculation to attribute it to the City's wrongful conduct.

Thus, we hold that the trial court abused its discretion in failing to direct a remittitur or a new trial as to these two customers. In its brief before this court, Whittier Fuel attributes damages of $31,500.00 and $12,250.00 to Begich Towers and Sportsman's Inn, respectively, and those amounts seem a reasonable allocation of the jury's award attributable to those items.[31] A remittitur of $43,750.00 thus would have been appropriate.

■ We believe that the trial court abused its discretion in failing to order a remittitur, or, in the alternative, a new trial.[32]

---

**28.** Here, the testimony was more concrete than that in the Oregon cases to which we have been referred. *Kwipco, Inc. v. General Trailer Co., Inc.,* 515 P.2d at 1319, involved allegations of loss of goodwill which were disallowed due to lack of evidence that annual profits or gross sales were decreased. The plaintiff's conclusory testimony that he lost "about $4900" in earnings was held insufficient in *Pearson v. Schmitt,* 487 P.2d at 96. In *Levene v. City of Salem,* 229 P.2d at 264, the statement that the plaintiff lost $1,000.00 in goodwill was held insufficient.

**29.** We approve of the Instruction No. 13 utilized here:

In all such cases where a party to an action asks for monetary damages, the burden is upon that party to show that he has been injured, and also, with reasonable certainty

and by the best measure that can be used under the circumstances, the amount of the compensatory damages which he claims. The plaintiff must prove his damages by a preponderance of the evidence.

**30.** *See Dowling Supply & Equipment, Inc. v. City of Anchorage,* 490 P.2d 907, 909 (Alaska 1971):

The rule against recovery of uncertain damages is . . . generally directed against uncertainty with respect to the cause of rather than the extent of damages.

**31.** See the breakdown of damages, *supra.*

**32.** Since damages were proven sufficiently to sustain a verdict in an amount smaller than $68,650.00, the City's motions for directed verdict and judgment notwithstanding the verdict

Viewing the evidence in a light most favorable to Whittier Fuel, we find no reason to reverse the superior court's judgment as to the remainder of the award.[33]

## INCONSISTENT VERDICTS

The City contends that the superior court should have granted a new trial due to conflicting verdicts.

The City asserts that the two special verdicts returned by the jury were inconsistent in that no reasonable jury could fail to return damages for replacement of the leased truck and also find lost profits. The City failed to object to the blank verdict or request that the jury be instructed to deliberate further as to that item. It further appears that this point was not presented to the trial court in the City's memorandum in support of a motion for a new trial.[34] Rather, the issue was raised in the City's statement of points on appeal.

Thus, the issue is not properly before us.[35] In any event, we do not believe that the verdicts were irreconcilable. The jury could have been unable to agree on replacement damages. Even assuming that the blank special verdict for replacement damages represented a determination that Whittier Fuel incurred no damages in replacing the leased truck, it is not necessarily inconsistent to find damages for lost profits. The jury could have determined replacement damages to be uncertain, while lost profits were shown. Alternatively, the jury could have found evidence pertinent to replacement costs unworthy of belief.

## JURY INSTRUCTIONS

The City argues that Instructions 13 and 16 were improper. The City had

were properly denied. However, the trial court should have instructed the jury to disregard the speculative components of the allegations of damages in response to the motion for a directed verdict.

**33.** *See International Brotherhood of Teamsters, Local 959 v. King,* 572 P.2d 1168, 1178–79 (Alaska 1977).

**34.** Civil Rule 59(b) provides:

objected to the underscored portions of each instruction. Instruction 13 read as follows:

In all such cases where a party to an action asks for monetary damages, the burden is upon that party to show that he has been injured, and also, with reasonable certainty and *by the best measure that can be used under the circumstances,* the amount of the compensatory damages which he claims. The plaintiff must prove his damages by a preponderance of the evidence. (emphasis added)

Instruction 16 read as follows:

The law permits compensatory damages awarded for a breach of contract to include loss of profit when at the time of contracting, the parties knew, or could reasonably be supposed to have had in their contemplation, facts which ordinarily would lead a person to expect loss of profits if a breach of the contract occurred.

*For example, if the parties at the time of contracting knew or could have reasonably known from the facts that the plaintiff planned to deliver fuel to the entire community and could not do so without the truck, then loss of profits would be a proper element of the compensatory damages. I do not indicate from the example that those facts existed or did not exist, or that they are the only facts which would entitle you to consider loss of profit.*

You must determine from the facts which you find whether the plaintiff is entitled to compensation for loss of profit. If you decide in the affirmative then you properly must consider any loss of profit. (emphasis added)

*Motion: Time for Serving–Statement of Grounds.* A motion for a new trial shall be served not later than 10 days after the entry of the judgment. The motion shall state the grounds upon which the moving party relies and shall refer to the papers on which the motion is to be based.

**35.** *See generally, University of Alaska v. Simpson Bldg. Supply,* 530 P.2d 1317, 1324 (Alaska 1975); *Padgett v. Theus,* 484 P.2d 697, 700 (Alaska 1971).

First, as to both instructions, the City argues that the jury was instructed that it must necessarily award damages. Secondly, the City argues that the underscored portion of Instruction 16 gave the jury the impression that fuel delivery to the community of Whittier was contemplated by the parties.

The City's arguments are not persuasive. Instruction 13 primarily concerned burden of proof. Instruction 16 merely stated that the "law permits compensatory damages . . . to include loss of profits." Further, Instruction 12 stated in part:

Your verdict in this case will determine the amount, *if any,* of compensatory damages due the plaintiff. (emphasis added) [36]

Thus, the jury was not instructed that they must necessarily return a damage award.

The City's objection to Instruction 16 on the grounds that the example implied foreseeability is frivolous.[37] The instruction itself contained a specific disclaimer on this point.

### PRE–JUDGMENT INTEREST

The superior court awarded pre-judgment interest at 6 percent per annum on the entire award of $68,650.00. This was error since a significant portion of the award was composed of damages for loss of future profits which had not yet accrued at the time of judgment. In *State v. Phillips,* 470 P.2d 266, 274 (Alaska 1970), we stated:

All damages then, whether liquidated or unliquidated, pecuniary or nonpecuniary, should carry interest from the time the cause of action accrues, unless for some reason peculiar to an individual case such an award of interest would do an injustice.

We believe an injustice would be done if interest is awarded on lost future profits not yet accrued at the time of judgment.

We further hold that the portion of damages allocated to loss of future profits should be discounted to present value. This result is not inconsistent with *Beaulieu v. Elliott,* 434 P.2d 665, 671–72 (Alaska 1967), and its progeny,[38] where we have held that tort recovery for loss of future wages should not be discounted due to the predictable impact of the inflationary spiral on the wage scale. *Beaulieu* has limited applicability to contract cases; and we decline to follow it in damage awards for loss of future profits since the impact of inflation on the profit margin is unclear. Receipt of the profits prior to the time they would have accrued but for the breach allows an opportunity for investment of the same.

### CONCLUSION

We remand this case to the superior court with directions to order a remittitur, as specified above, or, in the alternative, a new trial. If a remittitur is accepted by Whittier Fuel, those profits not yet accrued as of the date of the prior judgment should be discounted to present value. The remainder are subject to pre-judgment interest.[39]

REMANDED.

MATTHEWS, J., not participating.

---

**36.** The court also instructed the jury that "you are to consider all the instructions as a whole and are to regard each in light of all the others."

**37.** We have previously disapproved of argumentative, pro and con instructions. *Poulin v. Zartman,* 542 P.2d 251, 272 (Alaska 1975), *reh.,* 548 P.2d 1299 (Alaska 1976); *Clary v. Fifth Avenue Chrysler Center, Inc.,* 454 P.2d 244, 251 (Alaska 1969).

**38.** *See, e. g., Leavitt v. Gillaspie,* 443 P.2d 61, 69 (Alaska 1968); *but see, Alaska Airlines, Inc. v. Sweat,* 568 P.2d 916, 933–34 (Alaska 1977), where reduction to present value was held appropriate due to the computation of pension benefits which already included an inflationary factor.

**39.** The entire judgment as thus computed would be subject to post-judgment interest from the date it was originally entered.